All right, good morning everyone. Good morning. My name is Faisal Qaddafi. VPC Pizza is a top-rated company in the world for its location, plaintiff, appellant, and cross-appellant. We use Eat Pizza at Downtown Naperville, LLC, and other low-life buildings. We're a life-long company. Barry Allen-Konsalzi and Joe Locascio are veterans' appellants and cross-appellants. Thank you. On behalf of the appellant, Mr. Caruso, you may proceed. Good morning, Your Honor. May it please the Court. Carmen Caruso representing the appellant, Eat Pizza, which is a Giordano's Pizza franchisee in Downtown Naperville. And we're here as the appellants, and we also have a motion to dismiss the cross-appeal that I don't believe was ever ruled on, but I'm happy to hold those remarks until my rebuttal after Counsel presents his cross-appeal. I think they'd be appropriate. Thank you, Judge. On our appeal, we contend that we prevailed as the defendants in the trial court. We were hit with a two-count complaint for possession and rent under the Illinois Enforceable Statute. The case went to trial in July of 2014, and at the conclusion of the plaintiff's case, Judge Wheaton directed findings for the defendant, my client, on the issue of possession. The judge stated at the conclusion of that hearing, that trial, bench trial in July of 2014, that she was going to hold the case open to try and determine the amount of rent that would be due, which was really the underlying dispute. That dragged out for a year. We resumed the trial in July of 2015. Over my objection, Judge Wheaton allowed the claimant, VPC, to basically reopen the plaintiff's case to try and establish what they believed the rent would be due. And at the end of the bench trial in July 15, Judge Wheaton, on the record, went through the disputed parts of the lease regarding the common area maintenance and the property tax, and the court held that the tenants, and they were actually the sub-tenant, I'll get into that in a second, the sub-tenant share would be 9.78% of the common area, and again, 9.78 for the property tax. Could you tell me what the town assessor valued the first floor retail space at? I don't believe I had that, but I also don't believe that they did a separate evaluation. My understanding is they valued the whole building, and then it was a matter of working down to what the restaurant share would be. Well, I thought that the percentage specified by the township was 27% for the retail space, and I assumed that 27% is roughly one quarter of the total assessment. Your Honor, I apologize. I don't have that fat candy, and I do apologize. My understanding was that the VPC, which was the franchisor standing in the shoes of the landlord, was working from a bill that would be applicable to the building as a whole, the first floor and the upper floors, and that there was not a separate assessment made for the retail. But if I'm wrong, then I would certainly stand corrected. It's improbable that the town assessor assessed the property you said, but if you looked at their worksheets, you might find that it had a worksheet that had the residential above determine the amenities, the square footage, so on and so forth, whether there were parking available for the upper floors and so on, and gave a value for each unit, depending on its square footage, and then did the same thing for the retail space as well, assuming that you, as the major or a substantive portion of the first floor retail space, either had access to a delivery, a garbage-accessible spot, or had a reserved parking space that grew based upon whatever the lease said. So we've had appeals where we have had to decide things like this, and we've been told that this is the way assessors do things, and I spent seven years representing the supervisor of assessments in DuPage County, and in the process, I got a little knowledge of what they do relative to how they determine what an assessment should be, applying multipliers, equalizers, and so on. And so when I read that the assessor came up with something like a 27% evaluation for the retail portion and the remainder in residential, it suggested to me that maybe the assessment that VPC applied, which was to use the same relative factors, might be appropriate. It doesn't seem that – it would seem to me, to put it another way, that if you are responsible for the common areas only for the retail, it would seem to me that if you use the same logic, you'd only be responsible for the same proportion of share for the taxes that were assessed against the retail area. And if that's true, there's no reason to divide your area or the total retail area into the total square footage of the building. Your Honor, the work papers of the assessor were not, to my knowledge, brought into evidence and were not part of the argument or the trial court's decision, to the best of my knowledge of the record. And my understanding is that what VPC was arguing, and we were really in the position of responding to their arguments, is that they wanted to look at the common area maintenance and the taxes for the building as a whole. And then when they do their math, and I'll let counsel do his own math, he came out to either 70%, which would be a share of the whole building, with an exclusion of the part of the first floor that's now used by the College of DuPage, or if we were to win on the part about the College of DuPage space being retail, because it had been retail before the college took over, then they brought their number down to 49%, and some odd number there. So we were responding to their arguments that we either wrote 70% or 49% of the common area maintenance and property tax of the building as a whole. And we argued in closing that that wouldn't be correct, and Judge Wheaton acknowledged that she was accepting my calculations in the 2015 trial of the 9.78%, which was after you limited our share to the share that's truly attributable to the restaurant, acknowledging that the other part of the first floor used by the college was retail, because that was the original use of the space at the time of the lease. If you're going to use that percentage, doesn't that also presume that if equity applies, that the rate per square foot for retail space is exactly the same rate as the square footage rate for the residential property? Because let's say, for instance, the residential is one half of the retail. Then by dividing that in, you are coming up with a factor that would, in essence, benefit you because you're now taking a much larger portion with a lower square footage. And you could have it the other way around, too. My response would be that that's something that the parties would negotiate in writing the lease, and Judge Wheaton was concerned with construing the 2005 lease as opposed to getting into what the parties' other rational, intelligent people might have bargained for. So again, that argument was not made in the trial court, and it's not something we responded to, and I don't believe it's something that Judge Wheaton considered because the argument wasn't made. The 2005 lease had been in existence for eight or nine years by the time of this dispute, and at one point during the trial, we sought to introduce evidence of the parties' course of performance under the lease. We sought to introduce evidence of the way the original owner and the original property management company had calculated the lease, and Judge Wheaton, she sustained VPC's objection to the consideration of extrinsic evidence and said she was going to limit the ruling to her construction of the lease. And once she made that ruling, then we said that that's when we presented our 9.78 calculation, that that's how we read the lease, and the trial court agreed. I think that had the court considered our extrinsic evidence, the course of performance would have probably pegged us around something between 15 and 20 percent, and not the 9.78 percent, based on some of the things like allocating to us a share of the parking lot where we were allowed to park our delivery trucks. We were prepared to present that evidence, and VPC objected because VPC wasn't looking for a ruling in the 15 to 20 percent neighborhood. VPC was arguing that the pizza restaurant was responsible for either as much as 70 percent or as low as 49 percent of the total, and that was just an erroneous reading of the lease. And when you excluded the course of performance evidence, the trial court read the lease and construed it as 9.78. And as Judge Wheaton noted in her ruling, that this is the number Mr. Caruso came up with. And that's why we contend we prevailed, because we went to trial on possession, we won on directed findings. We had to come back for another trial on what is the rent that was due, and after the extrinsic evidence was excluded, we offered the 9.78, and the trial court agreed to the penny. The trial court awarded VPC over $199,000, right? Right. And that's because during the pendency of the litigation, we were paying the base rent, but they weren't charging us by agreement on the record. They weren't charging the CAM or the property tax during the litigation. So obviously some amount was going to be due. We never contended that the rent would be the CAM and the property tax would be zero. That would have been a frivolous position. It was simply a matter of determining the amount. As a result of this litigation, possession claims directed out in your favor. Yes. The trial court awards the other side $199,000, and that doesn't enter into the mix on who's the prevailing party. Well, I think that's form over substance, because the $199,000 is what we acknowledged that we would owe, and we acknowledged that in our closing argument, and the trial court agreed with us to the penny when she accepted my calculation at 9.78%, construing the lease. Didn't your client indicate that they would revoke any automatic payments if there was any attempt to take any monies, debit any monies for either the taxes or the CAM? There was an initial email and evidence to that effect, but then there were discussions that Mr. Renishon testified to, and the bottom line is we had the money on deposit the whole time, and they never attempted to debit the account, and the judge, and I think this finding was based on the facts presented, the judge's interpretation of the evidence, that we fulfilled our obligations under the lease by having the money on deposit, because they never attempted to draw it, not in the first month or in any of the other months. Let me see if I can call the essence of the argument on the prevailing party issue. Litigation ensues. You're saying in the middle of the trial or toward the end of the trial, one of the parties somehow agrees with the other side's position on an issue. Judgment is entered then, modifying and ordering money to be paid to the other side. Your position is they didn't prevail because in the middle of the trial we agreed with their position? No, I wouldn't say that, because what I disagree with, Your Honor, is the reference to the middle of the trial. We never denied that we would owe CAM or property tax. That would have been frivolous. So the whole ballgame was how much do you owe? You never objected to, look, we owe something, we owe some portion of taxes, we owe something for the CAM. Of course. And I assume that in July of 2014 you anticipated going to trial, maybe in a month or two, not a year later, and there was some tacit agreement, as long as we keep the money on deposit, that's sort of our escrow, here's our agreement, we won't pay anything until the trial's over. Is that a fair assessment? We agreed to pay the base rent. Not the rent. Right. But when we arrived for trial in July of 2014, on the first trial day, we expected the whole case to be tried there. We didn't expect that we'd have to come back for a second on rent. But we were prepared to pay rent. We never denied the obligation to pay CAM or the obligation to pay property tax. We were willing to pay what the way it had been calculated all along, and that was our course of performance evidence that they objected to, and that would, again, put it a little higher, between 15% to 20%, because I think it fluctuated a little each year in the first years after 2005. But we had the original property management people there in court to testify, but that evidence was excluded over objection, and so we were left to argue what the lease requires. And at that point, looking at Section 6.02 on common area maintenance, the judge agreed with our argument as to that. And it wasn't something we came up with in the middle of the trial. It was simply that some amount of rent had to be due, as the court stated, and it had to be determined. And it was determined 100% in the way we asked for it, and that's why we believe we prevailed, because they were seeing the possession issue and basically the other issue was not really seriously litigated, you said. Well, I would say it was seriously litigated. We came back for a second day of trial, and we were there for a second day of trial where they put on a case trying to establish that we were supposed to pay something in either the 49% or the 70%, which – and that position was flatly rejected. So we prevailed in the sense that the trial court accepted our interpretation of the lease and accepted our evidence and my argument as to what amounts would be due. Anything further? No. All right. Thank you. We'll have time, of course, on the prosecution. Thank you. Thank you. Counsel? Good morning, Your Honor. Good morning. Marvin Husby, H-U-S-B-Y, on behalf of the plaintiff's appellate. Your Honors, with regard to the attorney's fees issues, at the end of trial we were awarded almost $200,000 in damages. What's important to note is Mr. Caruso's argument would be better had he tendered his portion of CAM and taxes that he believed he owed. But instead what the defendant did in this case was send an email in August of 2013 that said you're not allowed to deduct from our account anything except for the base taxes. And what the case law says is that if you think you owe less or you think you owe less in relation to a five-day, you have to at least tender the part that you owe, that you don't owe anymore. What did the contract say? What did the lease say? The lease did say that the amounts would be deducted by ACH, but we then lost that permission, we believe, when we get a letter, an email, from the tenant that says you're not allowed to deduct from our account. I mean, there could be arguments of all kinds of banking frauds or things like that. Why the 70 versus 49.9 percent? Why is it that you were making representations that seem to indicate that you came up with formulas of 70 percent and 49 percent? Sure. And briefly, Judge, to address one of your questions that you asked Mr. Caruso, and Mr. Caruso, I believe, does not recall this, but Ms. Peckham did testify that what they originally asked the tenant for was a calculation based on the assessor assessing separately for retail, and your Honor's right, it was 27 percent. That was in the first day of trial discussed, admitted into evidence, and as well as it's in Mr. Jinkura's letter to the tenant that says, look, we have this amount, let's go by this amount. Well, they chose not to, which is really what precipitates this case. And so there's one way, which is, you know, Could you clarify one thing? Mr. Caruso said that you ultimately agreed that there wouldn't be any payments until the litigation was resolved. There was no agreement that I recall of that nature. Well, what about his argument that, okay, we won on the possession issue, we went into court acknowledging we owed something. We didn't deny that we owed something. It was a matter of calculations. So, therefore, you really didn't prevail on the issue because they acknowledged that they owed something. What's your response to that argument? They don't acknowledge that they owe something to us at any point in writing. It's only during the trial and cross-examination that Mr. Enesian states that, yeah, we knew we owed something. Your position is that they denied any CAM or taxes? Our position is they didn't tender any CAM. No, no, no. You said that they never said in writing that they owed anything. So your position would be that they denied owing CAM and taxes? I think it would be a stretch for me to say that I thought that they didn't owe any CAM or taxes. Actually, what they did say was at some point in response, they had said that they were owed a refund of CAM and taxes that they were previously paid. You mean that they had previously? That they had previously paid, that they were actually net positive on CAM and taxes. But that would be because of a change in the way it was going to be calculated. In other words, if we weren't going to go by the course of conduct in the past that arose at around 15 to 20 percent, then if it was really 9 percent, theoretically you did owe them money back. I think when the calculations are done, when you do the calculations of both CAM and taxes, together there's not a net refund. They owed money even with what they were claiming was not calculated properly. Back to your statement, your position is that they either denied they owed anything or... Our position is that they claimed to us that they overpaid. Okay, so that means, yes, they denied that they owed anything? Sure, sure. So counsel is mistaken when he says we acknowledge that we owed something. I would agree with that, yes. I guess what I'm trying to differentiate, Your Honor, is that they paid some CAM and taxes in advance. They said those payments were too much. So I don't want to say they denied, like the lease didn't call for it or anything like that. They acknowledge the lease called for CAM and taxes. Was there a common area maintenance fee in the books of the landlord that indicated that they had CAM for the entire building? These ought to be CAM for the first floor. Well, I think what the lease calls for is it has a specific formula in there. I'm not asking what they had to pay. I'm asking if the CAM that the landlord paid was a total amount that included as a portion there of the first floor CAM or was the CAM only designated for the first floor? What Ms. Peckham testifies to, and I hope I'm answering the question properly because I'm going to try to fully understand it, but what Ms. Peckham testifies to is that she did leave things out of the CAM that had no application at all to the businesses. But anything that had any application at all to the business was included in the total of CAM, and then they used the formula to determine their percentage. When it comes to taxes, what our argument was, Judge, was first we said if the court chooses to do justice because this chooses to make some type of justice argument and deviate from the lease, we said, look, the assessor's office, and Ms. Peckham testifies, the assessor's office says it's 25 percent of the total tax bill. So if you took 25 percent of the total tax bill, then you would multiply it by the formula in the lease, which is 70 percent. They act by 70 percent of the retail space. So for the first year that we argued, that would have been $28,000 versus the 9 percent would be roughly $15,000. So there was a difference there. And we said, Judge, if you're not going to – that's if you're going to try and do something different than the lease. But if you're going to do what the lease says, the lease is clear. And the lease is, we believe, 49 percent. I mean, the only disputed term would be leasable space. First of all, leasable space. Remember, we've got the college hallway. And I think Judge Wheaton's probably right when she rules. Look, if you're leasing the building to the college, you're leasing the common area to the college too, the hallway. So that's the 49 percent versus the 70 percent. So why are you the prevailing party in this case? We're the prevailing party because the tenant left us no alternative except to sue them. And they won on the possession issue. You sued them to take possession. They won. But we also sued them for money, and we won. We recovered funds that they had refused to pay. So you won on some part of litigation. Their side won on some of the others. So why would the trial court be obligated to give fees? To us. Yes. Because ultimately we were forced by the actions of the tenant to bring the suit to prevail. So when the tenant's in this dispute, they have a couple options. They get a five-day notice. They can pay what they believe they owe, and the law says they're supposed to tend to that amount. If he does that and the court says you tended the right amount, they win. The other option they had was to file a declaratory judgment action. What does the lease actually say? What does the court rule that the lease says? We believe it says this. And then they'd be the prevailing party. But instead they just sat back and said you can't deduct the money and left the landlord with no choice to either waive Camden taxes going forward or to sue them. And the court did rule we were entitled to Camden taxes and the financial benefit of those and awarded us $200,000. What's the standard of review on your denial of fees? Is it abuse of discretion or what's the standard of review? I believe it is abuse of discretion, Your Honor. I don't think that it's necessarily a legal issue. I think the court has discretion to determine who the prevailing party was. So you know what the standard is for prevailing on the abuse of discretion. The phrase generally is arbitrary, unreasonable, or no reasonable person would agree. Don't forget Capricious. Yes. Capricious or no reasonable person would agree with the ruling of the trial court. Does this rise to the level of that? We believe in recovering $200,000 from the defendant we were the prevailing party in that that was open and obvious. We also believe when you tie in the fact that we believe her underlying awarding, failure to award possession should be reversed by this court, that we would also be the prevailing party in that. Okay. And when calculating taxes in the CAM, we believe that the lease is clear. It gives a specific formula. And, in fact, Judge Wheaton thought it was clear. At one point at the end of the closing trial, Judge Wheaton says, this is simple arithmetic. We're going out of break. Go figure out what the arithmetic is. And for simple arithmetic, if the trial court correctly determines what is the space that is the subject of this CAM, I don't know if we need to get into that now, which is part of a cross appeal, but maybe just playing the scene in your mind as I'm looking at this, does the lease clearly specify CAM as those expenses related to the common areas of the ground floor retail space, correct? Ground floor retail space. Is that what it says? Yes. It says. Sorry. It's true, it's what it says. Yes, it says correct. So query, is the lobby area, which is currently met, uses retail space in the calculation? Is the lobby area in the calculation of CAM? Yes. There is, I believe the testimony. It's not messed up, right? I believe the testimony was from Ms. Packo was that there was a utility closet that had a light bulb in it, in that area that was included. Well, just so I understand, the trial court did specify the lobby is part of a leaseable ground floor retail space, right? Isn't that what the trial court ruled? No, I believe the trial court ruled that the lobby was not ground floor. I'm sorry, you're correct. The lobby was ground floor retail space. Yes, yes. So, again, as Ms. Packo's testimony was, the first day of trial was that they excluded anything that clearly did not have any relation to the common areas. How much did Naper Place charge you for real estate taxes? Did Naper Place charge us? Apparently, you had a lease with the landlord. Yes. The owner of the property. Correct. They charged us, as Your Honor had calculated it, 27% based on the inmate police court judge. Originally, the assessor's office didn't do that. When this lease started, they didn't parcel off the retail space. It was only in the recent years that they did. So, Naper Place went into negotiations with us, and we signed a fourth amended lease. And pursuant to that formula... The formula that you apply is the formula that Naper Place applied or told you to apply? The formula of that... Comes out at 27%. 70% of 27%. Yes. Correct. Which would have been, for the first year, $28,000. And then we executed a fourth amended lease to reflect that, to clarify that. Would the court like me to address the motion to dismiss? Is there some stipulation between counsel on the time issues? We did have an agreement of 15, 10, and 5. Yes. In the motion to dismiss, Mr. Caruso argues that our appeal of the underlying issues is not timely because we had to appeal that within 30 days of the original court's ruling and not... Within 10 days of his notice of appeal? Within 10 days of his notice of appeal. We believe that second district is clear that unless there's a 304A finding after that original trial, the time to appeal the underlying case is told. Why would it make any difference with 304A or 301 or 303? Sure. And I think what the case law says is that in the case cited by Mr. Caruso, there was a finding that the issue of attorney's fees was collateral to the other issue. And therefore, it was... Was the issue of attorney's fees decided in the original judgment? It was not, in this case. It was decided by a separate judgment? So that there's actually two judgments, there's judgments determining what the... No, no, no judgment. ...CAM and the real estate taxes are, and then there's supposedly another judgment that related to attorney's fees and everybody was denied fees. Right. But we don't believe that... But what Judge Witten specifically did is after the trial, she ruled on the amounts owed for CAM and taxes, she continued the matter, the whole matter, for hearings on attorney's fees. And that's her specific language. And after the attorney's fee issue was ruled upon, was there 304A language or was that 304A language entered at the time the first judgment was entered? There was no 304A language at the time of the first judgment. Okay. At the time of the first ruling. And the whole matter was continued. And there was 304A language at the time that the attorney's fees were denied? I would have to look at the order. I don't know, but there was clearly nothing left in the case at that time. That's what I was going to ask. Yeah. What was left? So there was nothing left at that point. Okay. So at the time of the experiment, the criminal evidence department? No. Okay. So we have the issue of the cross-appeal. This was your argument on the attorney's fees, correct? Yes. Okay. So on the issue of the cross-appeal, again, we believe the lease is clear as to what the calculation should be. And the calculation should be 49% of the total tax bill and 49% of the total CAM. If the court, as we said earlier, if the court was going to do some type of redefining that issue in the interest of justice or something, certainly it shouldn't deviate from what the assessor's office attributes to the total amount of taxes. And, again, that's 70% of 27%. But we believe that the court should not be 49% of what? The total real estate bill or the real estate bill that was related to the 27% Amount? We believe that the court, that the lease is clear that we are entitled to 49.7% of the total tax bill. Because the lease defines as the calculation of taxes to be, and Mr. Crusoe argues, well, you're only entitled to the portion of the taxes that apply to the retail space. But then the lease goes on to say, and this is how you calculate the portion that applies to the retail space. And the formula is clear, and the formula is 49.7% of the total tax bill. And the same with CAM. And that excludes, I'm sorry, that includes the college as leaseable space on the first floor and includes the college as retail space, which I think there's a better argument to disagree with. But, in any event, we believe it's 49.7% is the formula, and there's no reason to deviate from the lease. We also argue that if the court were to deviate from the lease, it certainly can't give us less than what the portion of taxes are that we pay for the retail space. At least morally, with the idea that you're asking 49% of the total tax bill when the assessor's office indicated that its determination of valuation for purposes of multiplication by a tax rate is only 27%, which means you're pretty damn close to being asking for taxes that are almost double what the assessor has determined the taxes should be based upon the assessment. We do understand that issue, Judge. And that is why, when you look at the five-day notice, we didn't ask for 49.7%. We asked for 70% of the 27%. That's why, in Mr. Jankura's letter to the tenant, saying, well, this is how much you got. What are you asking for now? 49% or 27%? Or 70% of 27%? Yeah, sure. We believe the law doesn't allow the court to deviate for, in the interest of justice, when the lease is clear. We believe the four corners are clear. But if the court were to determine that it can deviate, then it shouldn't deviate to 9%. It should deviate to what the assessor said was a requirement. Do you understand the equity of if the landlord tells you that you owe them $10, then shouldn't you turn around and tell your sub-lessee that they owe you $10 instead of asking them to pay you $20 or $22? And that's what we did, Judge. We did. When the landlord asked us to – we don't find out about the 5-day notice until it expires. So we immediately go back to the landlord to not lose our property, right? To not lose the franchise space. We go back to them and we say, what's going on? They said, well, look, here's the letter we sent to your tenant. We wanted 70% of 27%. Here's the assessor's bill. Here's everything. We entered into the Fourth Amendment lease with them. Based on that, we believe it was more beneficial than what the lease said. And then we went to our sub-tenant and asked for the same, and asked for them to acknowledge the Fourth Amendment lease, which they refused to. And so then we were left with no choice. And so our argument to the court was both, Judge. If you file a lease, it's 49.7. And if you decide you're going to deviate from the lease, then the interest of justice, if you're going to deviate the interest of justice, what you would deviate to would be the 70% of 27%. Your client broke the lease, didn't they? No, neither – we did not break the lease. We purchased this property out of bankruptcy. I'm sorry? I'm sorry. We purchased – my client purchased Giardano's out of bankruptcy. So Giardano's broke the lease? Actually, ironically, the defendant in this case, the shareholder of the defendant in this case, was the CFO of Giardano's corporate at the time this was entered into. Giardano's not only went into bankruptcy, but actually the property went into bankruptcy as well. So who drafted the lease again? We're back to the question. Who drafted the lease? Who drafted the lease? The two parties to the lease were the original owner of the property who filed bankruptcy. It was purchased out of bankruptcy. And Giardano's corporate, when Mr. Anastasia was there as CFO, drafted the lease. So you didn't draft the lease? No. And my client then purchased it out of bankruptcy. Thank you. Your powers of cross-examination. Sorry, Judge. I appreciate that. Thank you. Sorry, Judge. We did not draft the lease. Go ahead. You still have some time left, but I'll hear from you. So 30 seconds, do you want to sum up? Yes. We believe that, as we said to the trial court, we should be either getting, if you stick to the lease, 49.7% of CAM and taxes, or if you're deviating the interest of justice because the assessor has now calculated the retail portion to be 27%, then it would be 70% of 27%. Okay. Thank you. Thank you, Your Honor. First of all, let me apologize. In my remarks earlier, I had forgotten about the 27%. He's right. It came from Ms. Peckham, their witness, when they called the current property manager. And the reason I apologize that I didn't remember it is that was back in the trial on possession in July of 2014. And when we got to the trial, the resumed trial on the question of what rent or the CAM and tax as part of the rent, what was actually due, they didn't present that argument. My understanding is that they were going for the 49% or the 70%, and they were trying to present the 49% as their attempt to be reasonable instead of demanding 70%. And that's the argument they made. So they never made the argument that the original request was the most accurate one? No, I don't believe that. So Justice Wheaton was never given the opportunity to deliberate on whether that was the appropriate one vis-à-vis the new demand and your interpretation? That's my recollection of the July 2015 trial, and I'm sure the transcript we can check, but I'm sure that's it. Because they were clearly going for the 49%, as I think counsel affirmed this morning, that they believe it should be the 49%. And our position was that if we're not going to get into course of performance and we're back to the lease, then clearly under 6.02, which your Honor mentioned, it clearly pertains to common areas of the ground floor, which rules out their attempt to stick us with a percentage based on the building as a whole, including its upper floors, we believe. And Judge Wheaton agreed. That's ultimately why we believe we prevailed. Let's clarify that. The retail ground floor was on the CAN calculation, right? Was that the same limiting language on the taxes? Is that what you're saying? Well, that's clearly what the judge found. That's what she found. Because she found something in 702A talking about real property taxes on the lease premises. And 702B is a bit confusing because it talks about how the taxes may be imposed on the entire development or on a portion thereof. Right. But I think when you read the lease as a whole, there was never an intent for the restaurant or the other two small retail tenants to be paying taxes for the whole building based on their proportionate share, looking only at the first floor. That would be a very unusual interpretation, and that's how the judge found it. So you're saying the judge rendered an unusual judgment? No, I think that the judge was correct in getting to 9.78 as the CAN and the property taxes do. So it has to be your argument that the same formula applies to both, right? Right, and that's what the judge found. That's what Judge Wheaton found. We'll decide whether or not that's correct, but that's your argument. Yes, and that's why I'm here arguing that I prevailed because in the ruling and in the July 15 trial, the trial court agreed with the defense's calculation on the rent on the CAN and the property taxes. I do want to turn briefly to the cross appeal. The order in December 10 was a final order. And in paragraph 1, we have judgment and the judgment against them on possession, and then finding the 199-448 payment, which was now received, and that was based on the 9.78. Then in paragraph 4, the matter was continued to January 11, 2016, for hearing on cross motions for attorney's fees. The fee petitions, we filed one and then they answered with theirs, had been filed before the December final order. The trial court expressly ruled that it was not going to consider fee petitions until after the case was concluded, and the judge entered the final order. And it's our position that that did trigger the 30-day notice, the 30-day rule to appeal. For anyone who wanted to contest the ruling on possession, or for anyone who wanted to contest the underlying ruling as to what the proper allocation of the CAN and property taxes were, the matter is covered in the final order. And that under the Naperville case, the cases we've cited, they waive their right to try and reopen the case on possession or to contest the underlying amounts due under the lease. And we don't believe 304 language was necessary when the order was clearly on its face, a final order and a final judgment, and that would be erroneous to allow them to reopen it in that way. He can argue, he'd certainly argue that they prevailed, because that would be a proper response within 10 days. And if they had filed a notice of appeal, and then the arguments made at the attorney fee petition hearing was supposed to consider who prevailed, and the argument was raised that, well, who prevailed is on appeal, and therefore we can't consider who prevailed, so therefore we can't determine whether or not an attorney's fee should be granted. That's hypothetical, of course. I think the proper ruling, I think in that situation the trial court would have been entitled and it would have been proper for the trial court to make a ruling on fees based on the record as it existed, because my understanding is when a judgment is a final judgment, it's final and has all the res judicata effects unless and until it's overturned. The point that I'm trying to infer is that typically attorney fee petitions don't always relate to who prevailed. Do you see that? They may relate to 137 sanctions or a particular clause in the lease that says that if the landlord has to do anything litigation-wise and obtains judgment in its favor, then they're entitled to attorney's fees and doesn't say anything about you, the defendant, the tenant. I thought the lease has a prevailing party fee clause that we've cited. It does. I'm talking about in the situations. There are situations where you'll have different scenarios, so the scenario in a divorce situation, the fees relate to the work that's done, and it's based upon equity. It's based upon a lot of things, but it's not based upon who prevailed. In other words, the attorney's fees in a divorce aren't determined by who got the biggest piece of the pie or who got the kids. So when you start talking about this particular hearing on these two petitions, you're talking about what? You're talking about who is the prevailing party. Exactly. Okay. And if who is the prevailing party is based upon the judgment that is, quote, unquote, the basis of it, then why wouldn't it be appealable as an adjunct underlying subordinate order upon which the denial of attorney's fees is based on? What the court is saying is certainly possible, but if that were true, in that scenario, you would not have had a final order on December 10th. I thank you for your concession. We would have had what we would have had was just another preliminary order where the court was then holding open the final order and final judgment until the fees are decided. But that's not what we have here. We have a final order entering judgment on the underlying merits of the case, holding open the question of fees for subsequent collateral litigation. So just to clear up in my own mind, you said it wasn't necessary, which doesn't necessarily imply that it was or wasn't there. There was no 304A language in the alleged final order, was there? Correct. No, that's clear on its face. So it wasn't necessary and it wasn't there. It was not necessary to be there. It was a 301 or a 303 order is what your claim is, correct? Yes, that it was simply a final order on its face, resolving the matters in controversy, thus triggering the 30 days. Okay. Thank you. Thank you. Sir, I'd like to thank both counsels for the quality of the arguments here this morning. You're so good you don't need to. I'll take it, Judge. Thank you, Your Honors. Thank you, Mr. Cruz. And I'll be brief, Your Honors. You know, to say that we didn't present the argument of the 27% is false. With testimony, we introduced the assessor's apportionment, the documents from the assessor and their apportionment in trial. Judge Wheaton did not want to hear further testimony on that part of the issue. And as the court knows, she clearly said she was not allowing any extrinsic evidence in. Are the courts offended by the history of the transactions? Yes. And, you know, there was nothing else for us to present. We presented the 27% and she wasn't interested in it. So to say she didn't have that option I think is not correct. I think she had three options. I think she had that option, she had strict enforcement of the lease, and then the option Mr. Caruso presented, which we argue, Judge, was not based on any type of facts at all presented in this case. At no time was there any facts that anyone could have calculated 9.78%. Because there was no course of conduct, if there truly was a course of conduct that way. And so we believe that the ruling is incorrect, that the court should have selected one of the other two rulings as our main argument that the lease controls here, the four corners of the lease controls at the 49.7%. And when the court rules that way, we also believe the court then has no choice but to award us possession of the premises as well. Again, how many floors was this building? I'm not exactly sure. There's apartments above it. I don't recall offhand, but I think there was a few. Well, I assume that it was probably something similar to a cube. And if there were four floors and the ground floor was 27%, then the other three were something like 23 1⁄2, 23 1⁄2, 23 1⁄2, or something like that. If there were five floors, then it would be 27 and 15 or 18 from the top three, unless you had more opulent tenancies. Yeah. And the assessor's, I think it's the assessor's notes that you're on a record for doing it. It was Warren Dixon most likely. Yeah. It just broke out retail. It just hit retail. So at the 27%. And so we believe that, again, the tenant in this case had options. They could have tendered the amount that they thought they owed or they could have filed. When this dispute arose, they could have filed for a declaratory judgment. But instead, they let the five-day notice be served. They didn't tender anything and, in fact, told the landlord they couldn't deduct the rent and then forced the landlord to file to get any form of cam and taxes. I thought the rent was paid. I'm sorry. The cam and taxes. So and forced the landlord to file to get any form of cam or taxes. And by doing that, they took certain risks. And one of those risks was possession of the premises. So we also believe that we should be awarded possession of the premises. Anything further to add? No. Thank you, Your Honor. All right. Again, I'd like to thank both counsel for the quality of the arguments. The matter will, of course, be taken under advisement in a written decisional issue in due course. We'll stand in brief recess to prepare for the next case. Thank you. Thank you, Your Honor. Thank you.